This is the case of Diane Wickersheim v. Advocate Sherman Hospital And I'll quit with that and say this is case 124-2195. You have before you Justice Cynthia Cobb, Justice Nathan House, and Justice James Fitzgerald Smith. Our basic procedure is we give you the 15 minutes or so. We let you start and we don't interrupt you unless you go off on a tangent somewhere. Then we may start asking questions. Then we let the appellee give their presentation and the same happens there. And then the closing is the appellant. And with that, you may start. And please tell me who is who. This is Hugh Griffin, Judge. I am the attorney for the defendant, contemporary appellant, Advocate Sherman Hospital. Okay. And who else do we have? Good afternoon, Your Honors. My name is Michael Viglione. I represent the plaintiff, Appellee Diane Wickersheim. Okay, Mr. Griffin, you may proceed. Thank you. Excuse my tinted glasses. I hope it's okay. I had my cataracts removed. Yeah, you don't look like the guy I'm used to seeing. I might be age two in there somewhere. So I'd like to start actually with a decision that you, Justice Smith, set out more than 20 years ago in the Artesana case. And in that case, and I think the principle you stated is controlling here today. You held a document is protected from disclosure under the Medical Studies Act, where it establishes, quote, by its own content, that it served an integral function in the peer review information gathering and decision making process. And you cited for that the case of Toth v. Jensen, opinion by just the late Justice DeVito, where he applied the same analysis to a credentialing file materials that on examination show that they, too, served an integral function in the final determinations for appointment or reappointment of the physician in that case by the hospital's board of directors. And I would respectfully submit that exactly describes the documents that we're involved with here today for the P.A., that's P.A. Young, and led to her appointment and reappointment to the privileges that she sought at Advocate. And we said, of course, those are not the privileges, letters and grants are not protected. And we cited those in our brief. The documents themselves, I think, speak for themselves. They were standardized forms either evaluating various aspects of P.A. Young's professional competence or stating whether she is or is not recommended for appointment or reappointment for the privileges she sought. And they were completed and signed either by the Department of Surgery chair or another P.A., a peer reviewer, a peer peer reviewer, another certified P.A. reviewing her competency in various areas. There was one more called a scorecard, if you will, of whether certain targets, certain target goals were being met by P.A. Young. And clearly, again, going back to your holding, Justice Smith and Artisana, each of these documents by their own content showed that they served an integral function in the credentialing process that ended up in the issuance of their credentials. I mean, these documents also clearly fall right within the express language of the act itself, protecting all information, recommendations or third party confidential assessments of a health care professional's competence or other data of committees of licensed or accredited hospitals or their medical staff, including credentials and executive committees used in the course of internal quality control, including the granting, limiting or revoking of staff privileges. Now, there's one document that there's one set of documents that are a little bit outside of these others, and that is what's called the MSO reappointments. And what those are was a list of the experience of P.A. Young. And also there's one at issue here for Dr. Broderick as well. For P.A. Young, it documented how many surgical procedures by a surgeon that she participated in as a P.A. over the prior years involved. Again, I would respectfully submit that this document, again, falls squarely within the Artisana and Toth holding as a document that served an integral function in the information gathering and decision making process as to whether to issue her credentials. How do we know that? We know that from the application, which is not protected and which is it's in the record, which expressly in the clinical experience portion says the applicant must be able to provide documentation, a provision of services representative of the scope and complexity of the privileges requested during the prior year. Or if it's a reappointment, the applicant must have provided clinical services representative of the scope and complexity of the privileges requested during the past 36 months. So, again, by the application itself, the listing of this history, if you will, of prior experience, served an integral function in the decision making process. I think there's a second issue there, too, because obviously producing this history list, if you will, would also under the Anderson case, which we cited and argued in the brief, would necessarily reveal the internal review process itself. Anderson, if you recall, was a case where the court, the second district, held that discovery of medical journal articles written way prior to the time the peer review committee met was still protected because it would have revealed the committee's internal review process, what they were thinking, what they were looking at to make their decision. The same thing is true here with this MSO reappointments list. Again, it would show what experience and what metrics the committee was considered when they granted the privileges to P.A. Young and to Dr. Broderick. I mean, if you look at it, it's actually 12 subcategories of experience that they're requesting and looking at. And so, again, I know that there's the claim decision from the fifth district, which seemingly held that such a history list was not protected under the Medical Studies Act. I don't see in that case there was any discussion of Anderson or EID, which is the first district case which cited Anderson with approval. But I think there's a misconception in Klain and maybe other cases is a distinction has to be made between facts and documents. And nobody is saying that Klain could not submit an interrogatory to advocate asking, well, how many prior procedures did P.A. Young participate in? Or how many prior neurological surgeries did Dr. Broderick do? I mean, nobody's saying you can't do that. But that's different than saying you can have the document that the committee looked at in considering whether to issue the privileges, because now you are within the internal process of the committee. That's what you're getting to. You're getting to what they looked at, what they considered. And I think that's a distinction here that's kind of overlooked because you'll see statements like, well, if we hold that's protected, there's no case. I mean, that's just not true. The facts, again, just because facts are in a protected document doesn't mean those facts are protected. That takes me to the unusual part of this case, and that is the in any event, however you rule, we respectfully submit that you vacate the very onerous sanction that was entered here by Judge Otto. I don't think any of us are really concerned with that. Okay. Well, needless to say, my client and I are very concerned with that. Yeah, I think we already go along. If you mean you don't think because, of course, you know, there's many cases and we've cited them. Even where you lose your argument on privilege, it was a good faith argument. You were never contemptuous to the circuit court. And certainly we were not in many cases where we've lost the privilege argument. You've set that aside here, I submit, for the reasons I've outlined already. I believe we should be successful on our privilege claims. I mean, the other aspect of this is, and again, yes, there were 2,000 documents here. I mean, I have to give the judge the kudos on that, but it goes back to the plaintiff and the judge really on that. I mean, they had a very broad request for documents, all documents in your credentialing files, all documents in your privilege files of the hospital, of any committee, et cetera, et cetera. Finally limited that to five years, but, I mean, that still came out to 2,000 documents. There was no negligent credentialing claim here. Our relevancy objection was overruled. But the judge said, well, let me have an in-camera inspection of those documents. So we did. And, again, we felt the documents spoke for themselves for the reasons I've outlined already. And so when the judge came out with his initial ruling, there was a lot of inconsistencies. Again, these are standardized forms. And so there were six providers involved. And in many of the cases for the providers, he found that the form that we're concerned with with PA Young, the same kind of form, asking certain competency questions, asking for whether privileges were recommended or not, those were found protected. In fact, with Dr. Broderick, even the MSO form, there was another MSO form for a prior year that he found was protected. So we came back in with a motion to clarify it because we figured you had 2,000 documents to look at. We understand. So you may have some inconsistencies here. But he kind of dismissed that one out of hand, and we went back in on a motion to reconsider. And he found even in that motion that there were certain documents he should have protected, and he did. But the inconsistency point didn't seem to resonate. And so, as we set forth in the brief, for other providers, these same standardized forms asking the same kind of information about the provider in that case were held to be protected. So just another quirk in this case, and I think another indicia that these documents clearly are protected and fall right within the analysis that Justice Smith and other cases since then have made. It was an essential document to the credentialing process. And for that, I'll stand. All right. Mr. Griffin, how can the court determine committee involvement without evidence or an explanation of the content and asking this court to infer peer review origins solely from the face of the documents? You mean as to what committees were involved? We're getting a lot, but not specific things that we, maybe the trial courts are, but we don't have in the record. Well, I mean, I don't know what's lacking. I mean, we're relying on the very content of the documents themselves. I mean, they are third-party confidential assessments, either by a department chair or by another PA of the abilities and capabilities of PA Young. I mean, that's, it speaks, I don't know what an affidavit could add to that. That's what it is. And that's what it's, you know, and the cases have been clear. You can either submit the document or an affidavit. You don't have to do both. If you feel the document speaks for itself, then you can do that. And we felt the documents here spoke for themselves. Even the MSO documents spoke for themselves, given the application, which was before the court, requiring in the application that that kind of information be provided. You know, Justice Otto, he didn't, he said, I'm going to give you, I'm going to look at content and context. And so he did. I mean, he didn't, I mean, we're only talking about 13 documents here out of many, many, many, many, many, many more. So he didn't feel there was some substantial lacking of some kind of other evidence he needed to make a ruling. He never said that. So, again, I want to get to you what you feel is lacking and see if I can address it. I guess I'm saying, were the documents important to credentialing? What evidence shows they were initiated or generated by the peer review process? Well, they all come from the credentialing file. Now, there's an application that's not protected. These are all within that before and after? They're all after the application. If you go, that's what he meant. He said, I'm going to give you the context. I'm going to go through and look at the chronology. And so you start with the application, which isn't protected, and you go from there. And now all the other documents aren't necessarily going to be part of the credentialing process. And then if you go through it at the end, you find these aren't protected because it's the ultimate result. These are the letters from the Board of Directors saying you are hereby granted privileges for a certain period of time. So, again, Judge Otto gave us that. He didn't find any. He gave us that context. And all these documents come from the credentialing file. They all come after your application. So, obviously, they were all considered in terms of reaching the final decision of whether to grant privileges. So, then all of the documents submitted were privileged? No, no, no, no, not at all. Not at all. There's a lot of documents that were discoverable. But they were all a part of the credentialing process, so maybe I'm misunderstanding. Well, I mean, I don't – there was a lot of documents that just contained basic information about the person. There was pictures. There was insurance. I mean, we didn't feel like – I mean, we didn't feel any of that really fit within it. But these – I mean, the documents we're fighting about couldn't be more on point in terms of issuing the credentials. You know, there are third parties saying – reviewing the capability of the applicant and checking out – you know, there's checkboxes. That's how you do that. And then you have a bunch of boxes. Do you recommend? Do you not recommend? Those are completed. I mean, we produced all of the uncompleted ones. There's a lot of – we wanted to show what they were. But the completed ones, I mean, just fall squarely within the language of the Act itself. And squarely within, I think – I apologize. So earlier you said that the documents that Judge Otto – some of the documents that Judge Otto found were not privileged were the same in content. Some of the documents that he did find were privileged. So my question is, though, was there an issue about timing to when certain documents were created or for what purpose? Even though they were the same content-wise, were they created in these – for these different individuals at different points in time? Or were they all a part of peer review? You know, was there a timing issue for any of them, even if the content on their face was the same? There was never any – I mean, Judge Otto never made any such decision. That's why we went back in on the motion to clarify. We wanted to show him the inconsistencies and see maybe he had some other reason. But he just denied that one outright. He didn't want to – he didn't express any reasons to be – to consider them differently. I don't know how – you know, having looked at the files, I don't know – I can't see any reason. Again, the request was for five years of files. So, you know, they all start with an application again, which again is not protected. But then you go from there, and, you know, that starts the process. And then at the end, which is also not protected, there's an issuance of privileges. And that's not protected either. But all that in between, to the extent it meets the definition of what's protected, specifically third-party – confidential third-party assessments of a person's competency. That's right in the Act. And that's what these are, except for those MSO documents. And that's a little closer question. I've got Klain to deal with. But I don't think – I don't think Klain – again, I think the mistake of Klain was saying, no, you can't protect those kind of facts. And I don't dispute that. But you can still protect the documents because the documents themselves show what kind of metrics, what kind of experience the committee wanted to see. And that's part of their process. That's part of the internal process of the committee that is protected. And, again, if you want to ask an interrogatory about how many surgeries did he perform, how many surgeries did she assist in, you can do that. Even before the judge began his in-camera review, he kind of telegraphed what he was thinking, didn't he? He said, you want me to go through all this, and you didn't give me any affidavits. Is there a reason that no affidavits were submitted with the records? Well, the judge said, I want – he said, I want these tenured to me for an in-camera inspection. And then later on he said, well, you didn't give me any affidavits. But, I mean, he didn't – at the initial point, I don't believe he said, I want affidavits. But as far as these documents we're fighting about now, I mean, I don't know what an affidavit would add to the fact that, well, this is the department chair marking whether he thinks it's recommended or not that this person be getting the privilege. Or this is a peer reviewer's analysis of the competency of the applicant. I mean, I don't know what to say. I don't know how that would add to what the document itself provides. So, you know, we did not feel it was needed in terms of how clear these documents fit, both within – both within the language of the Act. And, again, clearly within, I think, the holding of the cases and so forth is serving an integral function in the peer review information gathering and decision-making process. They speak loudly of that. Anybody else? I'll give you one more, though. Given the manifest void standard here, what evidence makes the trial court's factual finding unreasonable? Well, again, there's no dispute of facts. And what makes it unreasonable is the documents themselves. They speak for themselves. They're either evaluations, again, of the various aspects of P.A. Young's professional competence or statements of whether she is or is not recommended for appointment or reappointment, completed and signed by department chairs or by peer reviewers. Or then there's a scorecard. Did you meet your goals? I mean, there's no dispute. I mean, I don't see the manifest weight issue. Again, Judge Otto, for the same kind of forms and completed in the same way for other providers, he thought they were protected. So I don't see a weighing process here. I think it is an issue of law. This is undisputed as to what these documents provide. And do they fall within the language of the Act as recommendations, third-party confidential assessments of a healthcare practitioner's competence? They do. And so, you know, we would say even if you want to, even under the manifest weight standard, if that is the standard, that there's only one, that, you know, the standard review here would require reversal, given the documents themselves and what they were used for. And that includes the MSO reappointments because they were required. It's right at the application. You've got to show us this before we were going to give you any, consider your application about privileges. You've got to give us this history. No further? No. Okay. Thank you. Michael, you may proceed. Thank you. Good afternoon, Your Honors. My name is Michael DeLeone. I represent the plaintiff, Ms. Diane Wickersheim, and may it please the court. This is a medical negligence case, Your Honors, where the defendant, Advocate Sherman Hospital, asserted Medical Studies Act privilege over 2,000 pages of documents. Advocate Sherman chose not to provide contextual affidavits or supporting materials to the court. And to answer Your Honors' questions, it was warned by the trial court judge, and it's at the record on pages 60 to 61, that if they were just going to ask the court to perform a facially-based contextual analysis, that he couldn't editorialize the documents. He could only use the documents themselves. They chose to invite the court to do that, and he overruled their privilege claims concerning 13 of those documents. We respectfully request that that order be affirmed for one simple reason. The defendant has failed to substantiate its burden in proving privilege under the applicable act. With respect to the standard of review, the Illinois Supreme Court noted in the Niven v. Sequeira 1985 case, the applicability of a discovery privilege is a matter of law for the court to determine, but the question of whether specific materials are part of a medical study is a factual question within that legal determination. And this court, in both the Ide case and the Mnookin case, has held that that factual determination is subject to a manifest weight of the evidence standard of review, which is a very deferential standard towards the trial court. It is black-letter Illinois law that a party asserting a discovery privilege bears the burden of substantiating that privilege. And what Advocate Sherman has done here, by providing the court 2,000 pages of materials without anything to editorialize or support the privilege, and just say, figure this out, effectively displaces that burden onto the trial court. And for that reason alone, we feel that with respect to these 13 documents, the appellant has failed to meet its burden in substantiating any privilege. If the court chooses, excuse me, to go further, the Medical Studies Act outlines that to prove privilege, a defendant must show that documents constitute information of a protected committee, and that they were used for internal quality control, medical study, reducing morbidity or mortality, or improving patient care. Since Roach v. Springfield Clinic, there has been over 30 years of unbroken precedent in Illinois establishing that to substantiate these factors, a defendant must show that a committee met, that it authorized creation of particular documents, and that those documents were created pursuant to that authorization, and then considered by that committee. Now, in this case, despite counsel's comments, these are not self-authenticating or self-explanatory documents, and I will say that to the court with all candor, I've not seen the documents, which puts the plaintiff at somewhat of a disadvantage here or in a precarious position, but to our knowledge, these are not self-explanatory or self-authenticating documents. So questions such as, did a committee exist? When did it meet? Who on the committee requested creation of particular documents? When did that happen? Were these documents created pursuant to that request? It strains credulity to the plaintiff to believe that these documents can answer those questions, and it's the answers to those questions that the defendant has to prove to substantiate its burden in proving Medical Studies Act privilege. And to answer your question, Justice Cobbs, yes, Judge Otto did raise a timing issue with respect to certain of these documents, and that's in the record at page 91. He suggested that he had to just take these documents in the order that he found them, so he was unaware, for example, if a committee had requested their creation or when they may have been created. What do we know as the plaintiff despite not seeing these documents? Well, we know, according to Klain v. Southern Illinois Hospital Services, 5th District, 2014, that a surgical procedures list is not privileged under the Medical Studies Act. The Klain case specifically said that that is just a fact that a hospital compiles outside of the peer review process, and that belated submission of that fact to a peer review committee, if that indeed ever happened here, doesn't render that information privileged under the Medical Studies Act. And it's not just Klain that says you can't take something that isn't privileged and give it to a committee and transform it into a privileged document. Roche says that. Berry v. West Suburban Hospital says that. There's 30 years of cases saying that. So that document, according to all those cases, should be produced. We also know, according to Klain, that results of any committee process are not privileged. So if these documents fall into that category, they should, in fact, be produced. The cases that the defendant has cited here as supporting its factual face-based analysis, we can just give the court 2,000 pages and say you figure it out, are an opposite, respectfully, Your Honors. Mnuchin was 24 documents with four context affidavits. Artesana, five documents with three context affidavits. Toth, which they rely most heavily on, was six documents. And I'd invite the court to look at pages 385 to 386 of the Toth opinion, because those documents must have had really small print. The appellate court lays out that they explained very, very, very extensive facts about the credentialing process, which allowed privilege to obtain in that instance. So barring these documents, having those same facts, we feel that Toth is distinct. Beyond that, the contempt citation, I know, Justice Smith, you spoke on that. That doesn't seem to be an issue. What we did lay out in the brief are the facts that led the judge to issue that citation. It's not squarely before this court. So unless Your Honors have questions on that, I'm going to rest on what we outlined in the briefs. But we do feel that that was a unique factual circumstance that if the court so chose, we could really use some guidance on to prevent a recurrence. Justices, for these reasons, more than happy, obviously, to take any questions. But barring any, we feel that the defendant has failed to sustain its burden in substantiating privilege. It has not proven that Judge Otto erred as evaluated, excuse me, on a manifest weight of the evidence standard. And we ask that his ruling be affirmed. Questions? Well, can a document ever be privileged based solely on its content without any affidavit attached? Well, Justice House, if we read Toth, and if we take one or so sentences out of Artisana, it appears the answer would be yes. With that said, when you're talking about the documents at issue here, they would nonetheless have to establish that a committee existed, met, requested or authorized their creation, and then deliberated and used them for the purpose enunciated by the Act. So unless they can show that, we feel that they can't meet their burden. Thank you. Anything else? I have nothing. All right, Mr. Griffin, you may do your conclusion. Thank you, Judge. Why do we have 2,000 documents? It's because at C-7750, Volume 4, there's this broad request for the credentialing and privileges filed by hospital, medical staff, ancillary medical staff, and any committee. So it's not that the hospital dumped 2,000 documents on anybody. It's that the plaintiff made this what we think was a way too broad request. There never was a negligent credentialing claim in the case. There still isn't. But that's why we have 2,000 documents. I don't know. It sounds like he's saying we need 2,000 affidavits. But again, we're back to the documents themselves in a credentialing file. Now, I know the cases he's citing, I've been involved in some of them. When you have a peer review of a medical incident, okay, that's where these cases he's citing come into play. You know, there's an incident. Okay. Somebody had a conversation. Was it authorized by the committee? Had the committee started? Did anybody direct the committee to have this conversation? That's where you get into all that issue when you're talking about a peer review of a specific medical incident. That's not what we're doing here. We're talking about the credentialing of two care providers. And it doesn't fit that framework. It starts with the application, and that's not protected. But going from there, now the file itself, you're in the process. You're in the credentialing process. And that's where these documents come from. And again, I'm not going to repeat again what they are, but, you know, they clearly, by their face, were served in an integral function in the information-gathering decision-making process. It's the competency of these providers. That's what they deal with. That's what they address. And then, again, I admit that the list of surgical procedures is a little different analysis. But, again, I think given the application, which says you've got to provide me with that kind of history before we will proceed on your application or certainly before we will grant you the privileges, it's within the same framework of something integral to that process. And the process goes throughout the whole credentialing file until there is a decision. And that is not protected. I'll just give you a couple of sites. Sub 2C1-314, Sub 2C1-338, Sub 2C1-1995, Sub 2C1-2016. These are all the granting of the privileges both to P.A. Young and to Dr. Broderick. That's the end of the process. And so I don't think these cases, the timing and when did the committee first look at it, was it an authorized conversation? They just don't fit this. This is a different animal. This is the credentialing process. And clearly these documents fell squarely within that process. Clearly they are third-party confidential assessments of the competency of the applicants. And so for that reason, we believe that even under a manifest weight standard, looking at the documents themselves, weighing those documents themselves, they clearly are protected. Again, I mean, most of them are check the boxes. I understand council hasn't seen the completed documents, but I believe we produced the uncompleted documents. So it's pretty clear what they are. The reviewer has to go and answer a bunch of questions about the applicant, and that's got to be protected. So unless there's any further questions, we would respectfully request that you reverse, of course, the sanction, and also the underlying discovery orders on these 13 documents at issue. Any further questions? I have none. Appreciate the opportunity. Thank you. All right. Well, I thank you, gentlemen. We'll look at this a little more closely and then give you a determination. Thank you for your time. Thank you, council.